BECHIK PRODUCTS, Inc.

v.

FEDERAL SILK MILLS, Inc., David Goetz and Rose Goetz, individually and doing business as Federal Silk Mills.

No. 7172.

United States District Court
D. Maryland, Civil Division.

Nov. 4, 1955.

---

Thomas W. Y. Clark, Baltimore, Md., and L. E. Matteson, St. Paul, Minn., for plaintiff.

Thomas J. Kenney, and Kenney & Kaiser, Baltimore, Md., and Bernard R. Garvey, of Washington, D. C., for defendants.

THOMSEN, Chief Judge.

Plaintiff, a distributor of bedding accessories, charges defendant[1] with unfair competition in the sale of mattress tape, and with violation of plaintiff's rights under the Lanham Act, 15 U.S.C.A. § 1051 et seq., in that for many years defendant manufactured certain tapes for plaintiff, which plaintiff sold under certain pattern numbers; that in 1953 defendant started to sell these tapes direct to mattress manufacturers at prices lower than plaintiff was charging; that for three months early in 1953 defendant advertised and sold four patterns under the same pattern numbers used by plaintiff to identify these patterns; and that plaintiff was forced to reduce its prices on its entire line of tapes. Plaintiff admits that defendant had the right to sell the identical patterns and at whatever price he chose, but contends that defendant had no right to designate them by the particular pattern numbers used by plaintiff, and that such designation tended to confuse the public as to the business source of the goods.

Defendant takes the position that the numbers were not trade marks; that plaintiff had no exclusive right to use the numbers, which were used by other distributors; and that, in any event, plaintiff lowered its prices because defendant was selling identical tapes at lower prices, not because defendant identified his tapes by any particular pattern numbers.

---

[1]. Plaintiff sued David Goetz and Rose Goetz, t/a Federal Silk Mills, and Federal Silk Mills, Inc. I have found as a fact that the tapes in question were sold by David Goetz individually, t/a Federal Silk Mills, and I will refer to him as "defendant". The possible liability of the other defendants will also be discussed.

As soon as he learned that plaintiff objected to the use of the numbers, defendant stopped using numbers and began to identify his tapes by letters—AAA, BBB, etc.—because, he said, he did not want to get into trouble, whether he was right or wrong.

At a pre-trial conference, counsel for defendant stated that defendant did not intend to use numbers to identify his tapes in the future, and would consent to an injunction against such use, without prejudice to his contention that he had not been guilty of any unfair competition. It was further agreed that defendant need not check the mass of evidence offered by plaintiff on the issue of damages unless and until the court rules that plaintiff is entitled to recover damages in this action.

### Facts

### The Parties.

Plaintiff has manufactured and sold bedding accessories since 1932, and is now reported to be the largest distributor of bedding accessories in the world. It sells to mattress manufacturers some forty parts that go into the making of mattresses, including mattress tape, which plaintiff has been selling since about 1940. It did not start manufacturing such tape until 1953 or 1954, but has purchased such tape from three or four companies from 1940 to date.

Defendant David Goetz, who trades as Federal Silk Mills, was originally a ribbon manufacturer. About 1933 he caused Federal Silk Mills, Inc., to be incorporated in Maryland, and transferred to the corporation the real estate and the machinery in his mill. The corporation still owns the real estate and the machinery, which are assessed for taxation at over $200,000, but sometime before 1940 the corporation ceased manufacturing and David Goetz, individually, trading as Federal Silk Mills, resumed his manufacturing activities. He pays rent to the corporation, of which he and his wife own all of the stock. Separate sets of books are kept for the corporation and for the individual enterprise. I find

that plaintiff had no reason to believe that it was dealing with the corporation. None of the letters or other papers offered in evidence purport to be signed by any officer of the corporation, but all are signed "Federal Silk Mills", with the name "David Goetz", or some other name, on the line below, without title.

Defendant Rose Goetz, wife of David Goetz, is associated with him in the business, but I find that she has not been his partner and would not be liable as such in this case. The facts that her signature, as well as that of the plant manager, was an authorized signature on the checking account of David Goetz, trading as Federal Silk Mills, and that she works in the office, took an active part in certain discussions with the plaintiff's officers, and referred to Federal Silk Mills as "we", are not sufficient to overcome the flat and uncontradicted testimony of David Goetz that she has no proprietary interest in the business, but that she is paid a salary by him individually, trading as Federal Silk Mills, and is also paid a salary by Federal Silk Mills, Inc. And I find the evidence insufficient to show that she had such knowedge of or participation in the acts alleged to constitute unfair competition as would make her liable as a tort feasor.

All dealings were between plaintiff and David Goetz, individually, trading as Federal Silk Mills.

### The Industry, and Plaintiff's Position Therein.

Mattress tape is used to join the side wall and the top of a mattress. Its quality depends upon the number of "ends" and "picks" in the warp and woof of the pattern, and on the size or weight of the yarn. It must be dense enough not to "pucker" in the sewing machines. The machines in general use in the United States call for $5/8$ inch tape with a tolerance of $1/32$ inch.

Most patterns and designs have been used for many years by all manufacturers, long before either the plaintiff or defendant went into the business,

though there may be slight variations in the construction (i. e. the number of ends and picks or the size or weight of the yarn) of the same pattern made by different manufacturers.

Mattress tape is distributed by several dozen manufacturers, jobbers and mill representatives, of whom some identify their patterns by numbers and some by descriptive names such as "Diagonal" or fanciful names such as "Marcy"; at least one distributor identifies some of its patterns by numbers and some by names.

Plaintiff uses numbers to designate its patterns, and makes an effort to select numbers which are not in current use by other distributors, although some other distributors use some of the numbers, e. g. 501 and 526, which plaintiff uses to designate the same or different patterns.

Neither the distributor's name nor the pattern number customarily appears on the tape itself or on the core on which the tape is wound. The loose end of a roll of tape is usually sealed with a tab or a pin. Plaintiff uses a tab on which is printed plaintiff's name but not the pattern number. Plaintiff supplies these tabs to the manufacturers from whom it buys tape, who attach the tabs, wrap ten rolls of the same pattern in a paper package, and seal the package at the top with a blue label, supplied by plaintiff, containing its name and the pattern number and color. Other labels are used to seal the bottom and sides of the package.

Most sales to a new customer are made by sample. Thereafter, a mattress manufacturer usually orders by pattern number and color.

It is possible for an experienced person to identify tape made by a particular manufacturer by noting the method of splicing and the method of rolling on the core.

Plaintiff is careful about the quality of its tape, and before selling a new pattern or construction has a sample run tried out by a mattress manufacturer. The Bechik tapes are recognized in the industry as being of good quality.

## Defendant's Activities, and the Course of Dealings Between The Parties.

Defendant entered the mattress tape business at about the same time as plaintiff, i. e. between 1939 and 1941. At first defendant sold through a distributor known as Interstate Ribbons Company, in which defendant and Penn Textile Company were interested. Defendant was then manufacturing most of the patterns which it subsequently manufactured for plaintiff, and was selling them under the pattern numbers used by Penn Textile Company. At or about the same time, defendant also sold tape to the Southern Bedding Company and to Lea & Sachs.

In April, 1941, defendant wrote plaintiff soliciting mattress tape business and stating that it understood plaintiff was "using tapes that we manufacture". Plaintiff replied, referring to "your number 1004", "our number 586" and other patterns. All of these numbers were the Penn Textile numbers, which both plaintiff and defendant had been using up to that time and continued to use for some years. Plaintiff began to buy a substantial part of its mattress tape requirements from defendant, but always bought from several other manufacturers. Plaintiff insisted, however, that defendant agree not to sell to Southern Bedding or any other distributor except Lea & Sachs, to whom plaintiff agreed defendant might sell four colors of the pattern originally known as number 586 and later sold by plaintiff as number 2005.

About 1945 defendant adopted a new system of numbering mattress tapes produced in his factory. Under that system, the number 4517 indicated that the pattern so designated was first made in the year 1945, and was the 7th sample produced in the 1st month of that year. Defendant assigned the number 4517 and similar numbers to each pattern which he made for plaintiff and to each change in the construction of each Bechik pattern. Plaintiff would sometimes either raise or lower the quality of a particular pattern for competitive reasons, and the new

construction would be given a new factory number by defendant, although plaintiff continued to sell the new construction under the old pattern number.

The general course of business between the parties was that plaintiff would place an order for so many thousand gross of a particular pattern to be made up by defendant, usually not to be delivered to plaintiff, but to be held by defendant against orders from plaintiff, known as drop-orders, to deliver various quantities to various customers of plaintiff. As a result, defendant frequently had on hand a substantial stock of tapes which plaintiff had ordered to be made up but had not yet ordered to be delivered. On one occasion at least, plaintiff helped defendant finance the carrying of this large amount of tape. To facilitate the delivery of drop-orders to plaintiff's customers, plaintiff supplied defendant with Bechik labels and tabs.

Plaintiff was always after defendant to be sure he did not sell to any one else, and defendant was always after plaintiff to give him a larger share of its business and to spread it more evenly over the year. As a result of the mutual distrust so generated, the parties in June, 1952, entered into the only written agreement offered in evidence. It provided:

"If, at any time, Bechik Products, Inc., decides to discontinue doing business with Federal Silk Mills it will give Federal Silk Mills a ninety day written notice and agrees to purchase from Federal Silk Mills 30,000 gross or more Mattress Tape, during said ninety day period, at prices prevailing at that time.

"Federal Silk Mills also agrees that at any time they decide to discontinue doing business with Bechik Products, Inc., they will give Bechik Products a ninety day notice and agrees to ship 30,000 gross or more Mattress Tape, during said ninety day period, at prices prevailing at that time."

Shortly thereafter the feeling between the parties became exacerbated, and in July, 1953, defendant wrote plaintiff: "* * * I am also, herewith, giving you notice as of July 20th, we are discontinuing any and all previous verbal or written arrangements which might have been made." Nevertheless, plaintiff placed some additional orders with defendant, and defendant filled some of those orders.

### The Present Controversy.

In December, 1953, defendant had on hand a stock of about 30,000 gross of tape made up on plaintiff's order. I find that plaintiff had ordered defendant to deliver some of this tape to its customers and that defendant had failed to make such deliveries, but that some of this tape represented tape which plaintiff had ordered defendant to make up but had never ordered defendant to deliver to it or its customers. It is impossible to tell from the evidence how much of the tape fell into each category.

In December, 1953, there was a strike in defendant's plant which was not settled until February 17, 1954. At some time, which cannot be determined from the evidence, defendant decided to sell direct to mattress manufacturers the tape which he was manufacturing. In the February, March, and April, 1954, issues of "Bedding", the trade journal for the industry, defendant inserted an advertisement which showed the four most popular patterns he had been making for plaintiff, identified by the same numbers under which plaintiff had been selling them, together with the following words: (The double underlining indicates very large type)

"Now * * * You Can
save
from 25¢–50¢ per gross
by buying your Mattress Tape
Direct From The Manufacturer

| | |
|---|---|
| Pattern 2005 | We have been manufacturers of tape since 1932. |
| Pattern 1000 | The bedding trade knows the quality of our products which formerly were distributed through |
| Pattern 650 | |

Pattern 500      jobbers.

> For immediate service, samples and prices, Call, Write or Wire
>
>                   federal
>                   ========
>                   silk mills
>        williamsport, maryland"

Defendant purchased from Boyd's City Dispatch, Inc., a list of all the mattress manufacturers in the United States, and sent each of them a circular letter, a copy of the advertisement, and samples of the tapes which he had made.

In the May, 1954, issue of "Bedding" a modified advertisement appeared. The same tapes were illustrated but they were designated by the letters AAA, BBB, CCC and DDD respectively, and the text was changed to read: "Now * * * You can save more Than Ever Before! by buying your Mattress Tape Direct From The Manufacturer low, low prices For Quality Tapes. We have been manufacturers of tape since 1932. The bedding trade knows the quality of our products which formerly were distributed through jobbers. For immediate service, samples and prices, Call, Write or Wire federal silk mills, williamsport, maryland."

On March 11, 1954, plaintiff filed the instant action in this court; and as soon as he was served, defendant stopped advertising and selling the tapes under the numbers used by plaintiff. Defendant tried to put the amended advertisement in the April issue of "Bedding" but found that it was too late. Defendant testified that he did not want any difficulty whether he was right or wrong. About the same time, the senior Bechik got in touch with defendant and told him that he (Bechik) did not mind defendant using the patterns but that he strongly objected to defendant using plaintiff's numbers.

In February, 1954, employees in defendant's plant opened all the packages of mattress tape which had theretofore been made up, removed Bechik's adhesive tabs which sealed the rolls of tape, re- sealed the rolls with plain adhesive tape, and wrapped them in new packages, each of which, as was customary, contained ten rolls of tape. To seal the top of the new packages defendant's employees used plaintiff's blue labels, after clipping off plaintiff's name and address. I find, however, that all of these packages were delivered in cartons or other containers which showed clearly that they came from Federal Silk Mills, and that in no case was there any confusion in the minds of any purchaser with respect to the source of the goods he was purchasing from Federal Silk Mills. Plaintiff suffered no damage from this use of the labels, except the value of the labels themselves, which is not claimed in this case.

■■  In the latter part of 1954 Harry Hirsch, who was connected with David Raider & Son, of New York, was engaged by Federal Silk Mills to sell mattress tape on commission in the New York metropolitan area. At Hirsch's request, defendant supplied him with a list of plaintiff's customers to whom defendant had delivered tape over the years. Hirsch used this list in soliciting business. At the show in Chicago in the fall of 1954, defendant had a booth where he showed his mattress tape. Hirsch was present and used the list of plaintiff's customers in soliciting business. Shortly thereafter Hirsch ceased to sell for defendant and became plaintiff's New York representative. At that time, he turned over to plaintiff a list of accounts he had solicited for other principals. I find, as Hirsch testified, that plaintiff, defendant and others in the trade regarded the selling of bedding accessories as a "rough" business where "you had to use every means to make a sale". I find that defendant's solicitation of plaintiff's customers to whom defendant had delivered tape for plaintiff in the past, did not violate the standards of ethics prevailing in the trade. Moreover, I find that plaintiff has proved no damage caused by defendant's use of the list of plaintiff's customers in selling defendant's tape.

Plaintiff was selling fifteen different patterns of tape in February, 1954. As a result of defendant's selling similar tape at a lower price, plaintiff was forced to reduce the price of thirteen of these patterns in April, 1954. The price of one was reduced in March, 1954, and the price of one was reduced in October, 1954. Some prices were reduced a second time later in 1954 or in 1955, and a few were reduced three or four times.

I find that these reductions were caused by defendant's competition in selling similar tape at a lower price, but I do not find that such reductions were caused, to any appreciable extent, by any of the elements in the competition which plaintiff claims were unfair.

### Conclusions.

Federal law and Maryland law agree that the essential element of unfair competition is deception, by means of which the goods of one dealer are passed off as the goods of another. Goodyear's Rubber Manufacturing Co. v. Goodyear Rubber Co., 128 U.S. 598, 9 S. Ct. 166, 32 L.Ed. 535; Edmondson Village Theatre v. Einbinder, Md., 116 A.2d 377, 380. "The essence of the wrong in unfair competition consists in the sale of the goods of one manufacturer or vendor for those of another; and if defendant so conducts its business as not to palm off its goods as those of complainant, the action fails". Howe Scale Co. of 1886 v. Wyckoff, Seamans, etc., 198 U.S. 118, at page 140, 25 S.Ct. 609, 614, 49 L.Ed. 972. This rule has been reiterated by the Supreme Court, Hanover Star Mill Co. v. Metcalf, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713, and by the Courts of Appeals for the various circuits, most recently in West Point Manufacturing Co. v. Detroit Stamping Co., 6 Cir., 222 F. 2d 581, 586 et seq., where many cases are reviewed.

Plaintiff admits that the patterns were in the public domain, and that defendant had the right to sell at whatever price he chose the identical patterns he had manufactured for plaintiff. Plaintiff further admits that the numbers plaintiff used to identify its patterns were not trade marks, within the meaning of the Lanham Act. But plaintiff contends that the numbers, such as 2005, 1000, 650 and 500, applied to the particular patterns of mattress tape to which it applied them, had acquired a secondary meaning, and identified those tapes as Bechik tapes in the minds of mattress manufacturers, without the use of the Bechik name. This contention is not supported by the evidence.

It was shown that at least two other distributors use some of the same numbers that plaintiff uses to identify its tapes. One of those distributors is the Gibson Sales Company. The younger Bechik was asked: "Is Gibson selling your tape or somebody else's tape?" He replied: "He is selling somebody else's tape. It doesn't say 'Bechik's tape' on the Gibson price list". When asked "Why would it have to say 'Bechik's tape' on his price list if number 526 means to the trade a Bechik tape?", he replied that patterns no. 526 and no. 501 were insignificant numbers to plaintiff, not sold in any volume, and that plaintiff did not know Gibson was using the numbers. The witness Coran formerly worked for defendant, and now manufactures tape for plaintiff. Called by plaintiff, he referred to "Bechik's 2005", "Bechik's 1000" and "Bechik's 650". I find that this is the way the trade generally would think of the tapes, and that the numbers, unaccompanied by Bechik's name, had not acquired a secondary meaning which would identify a pattern as a Bechik product.

There is considerable doubt how far numeral systems as such may be subject to protection. Germanow v. Standard Unbreakable Watch Crystals, Inc., 283 N.Y. 1, 27 N.E.2d 212; William H. Keller v. Chicago Pneumatic Tool Co., 7 Cir., 298 F. 52; Dennison Mfg. Co. v. Scharf Tag, Label & Box Co., 6 Cir., 135 F. 625; Humphreys Homeopathic Medicine Co. v. Hilton, C.C.S.D.N.Y., 60 F. 756. In the following cases, however, the use of the same system of numbering was one of the factors, along with others more

important, which led the court to find unfair competition. Scriven v. North, 4 Cir., 134 F. 366; Enterprise Mfg. Co. v. Landers, Frary & Clark, 2 Cir., 131 F. 240; Noma Lites v. Lawn Spray, D.C. E.D.N.Y., 130 F.Supp. 124; Shaw Stocking Co. v. Mack, C.C.N.D.N.Y., 12 F. 707.

■ The rule seems to be that the use of numerals similar to those used by another to designate similar merchandise does not constitute unfair competition in the absence of conduct tending to pass off one man's merchandise as that of another. Matthews Conveyor Co. v. Palmer-Bee Co., 6 Cir., 135 F.2d 73, 83; James Heddon's Sons v. Millsite Steel & Wire Works, D.C., 35 F.Supp. 169, affirmed 6 Cir., 128 F.2d 6, certiorari denied 63 S.Ct. 79, 317 U.S. 674, 87 L.Ed. 541; 87 C.J.S., Trade-Marks, Etc., § 117, p. 395.

The Third Circuit has held, L'Aiglon Apparel v. Lana Lobell, Inc., 214 F.2d 649, that a new tort has been created by Section 43(a) of the Lanham Act, 15 U.S.C.A. § 1125(a), which provides that "Any person who shall * * use in connection with any goods * * any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods * * to enter into commerce, * * * shall be liable to a civil action by any person * * * who believes that he is or is likely to be damaged by the use of any such false description or representation." Judge Hastie's opinion recognizes, however, that other courts feel that "palming off" is still a necessary ingredient of an unfair competition case. Chamberlain v. Columbia Pictures Corp., 9 Cir., 186 F.2d 923; Samson Crane Co. v. Union National Sales, Inc., D.C.Mass., 87 F. Supp. 218, 222.

■ It is not necessary to attempt to reconcile any possible conflict in these authorities. The element of falsity, required by Section 43(a), is absent in the case at bar.

Assuming, as plaintiff contends, that defendant's original advertisement should be interpreted as stating, in effect, that defendant is now selling direct to the trade the same tapes which it formerly made for plaintiff, and which plaintiff sold under the numbers 2005, 1000, 650 and 500, where is the falsity? The statement is literally true.

Plaintiff argues that a reader of the advertisement would be led to believe "that the tape offered and sold by defendant was that theretofore approved and sold by the plaintiff". So it was. Plaintiff admits that defendant's tapes are of the same quality as plaintiff's, not an inferior product, as was the case in L'Aiglon Apparel v. Lana Lobell, Inc., supra, and in Mastercrafters Clock & Radio Co. v. Vacheron, 2 Cir., 221 F.2d 464.

Plaintiff contends that the sentence: "The bedding trade knows the quality of our products, which formerly were distributed through jobbers", implies that plaintiff no longer sells these patterns. It carries no such implication to me, and plaintiff produced no mattress manufacturer or other witness to testify that it carried that implication to him or that plaintiff lost any business thereby. Plaintiff was then, as it had been for many years, advertising and selling tapes which it bought from four or five different manufacturers. In Columbian Art Works v. Defiance Sales Corp., 7 Cir., 45 F.2d 342, the court found that the advertisements of the defendant in that case implied that the plaintiff had discontinued the manufacture of certain calendar pads, which was not true. The advertisements in the case at bar implied at most that plaintiff would no longer market tapes manufactured by defendant, but that defendant would sell them direct to mattress manufacturers, which was true; the advertisements did not imply that plaintiff would not continue to sell the same patterns, manufactured by other producers.

No witness testified that defendant's advertisements or other sales efforts con-

fused him as to the origin of the tapes. This is the important point.

 Plaintiff argues that "there is not a false representation of source of products in this case, but a false representation of source of warranty or sponsorship". It is true that a violation of a trade mark indicating the origin of selection and classification, as of flour, may be actionable. Menendez v. Holt, 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526. But there was no trade mark to violate in this case, and no false representation of source of warranty or sponsorship. No purchaser thought plaintiff was warranting or sponsoring any goods such purchaser bought from defendant. The only people who purchased mattress tape from either plaintiff or defendant were mattress manufacturers, and there is no evidence that any of them were deceived.

Defendant's solicitation of the customers to whom it had formerly shipped tape for plaintiff does not meet the ethical standards we would like to see obtain in the business world. And it is true that "the tendency of the law is to enforce higher standards of fairness and commercial morality in trade, depending upon the character and nature thereof." Noma Lites v. Lawn Spray, Inc., D.C.E. D.N.Y., 130 F.Supp. 124, 127, and cases there cited; Edmondson Village Theatre, Inc. v. Einbinder, supra; 3 Restatement, Torts, ch. 35, pp. 539, 540. But what competition is unfair must depend to some extent upon the standards which prevail in the particular market-place. Germanow v. Standard Unbreakable Watch Crystals, Inc., supra. This market-place was "rough". According to plaintiff's witness Hirsch, it was one in which "you have to use every means to make a sale".

Finally, there is no evidence that plaintiff lost any sales as a result of that solicitation or by reason of any of the elements in the competition which plaintiff claims were unfair. Plaintiff's damage was caused by defendant selling identical tapes at a lower price; and for such damage the law affords no redress.

I will enter a decree, pursuant to the understanding at the pre-trial conference, enjoining defendant David Goetz from using numbers to identify his mattress tapes, and denying plaintiff any other relief; each party to bear its own costs.