## JAMES HEDDON'S SONS v. MILLSITE STEEL & WIRE WORKS, Inc.

### Civ. No. 966.

District Court, E. D. Michigan, S. D.
Oct. 10, 1940.

Banning & Banning, Samuel W. Banning, Lawrence I. Wood, and Lloyd D. Heth, all of Chicago, Ill., and Francis D. Hardesty, of Detroit, Mich., for plaintiff.

Barthel & Bugbee, Otto F. Barthel, Willis Bugbee, and Julian Caplan, all of Detroit, Mich., for defendant.

TUTTLE, District Judge.

This is a patent and trade-mark infringement suit with numerous charges of unfair competition. This suit was filed April 10, 1939, and is coupled with a counterclaim by the defendant. Both plaintiff and defendant are Michigan corporations.

The plaintiff charges defendant with infringement of Jamar patent No. 1,892,892, issued to plaintiff January 3, 1933, and of Wooster design patent No. 93,370, issued to plaintiff September 18, 1934. Both of these patents relate to fish baits.

The plaintiff also charges the defendant with infringement of registered trade-mark No. 345,384 issued to plaintiff April 27, 1927, on a red stripe applied to one or more edges of boxes or labels for fishing tackle, and of registered trade-mark No. 154,046 issued to plaintiff April 4, 1922, on the words "Head-On Basser" for fish baits.

The plaintiff also charges the defendant with unfair competition summarized as follows:

a. Allegedly configuring its fish baits like plaintiff's "River Runt" baits.

b. Applying thereto a collar (chin piece) allegedly copying plaintiff's bait collar.

c. Applying thereto a herringbone decoration.

d. Using red-edged boxes and labels for fish baits.

e. Using the word "basser" for fish baits.

f. Using the word "wounded" for composition baits.

g. Using the numeral 9 and the letter R for allegedly similar baits.

h. Publishing a color chart of baits allegedly simulating plaintiff's color chart.

i. Publishing an advance announcement in October, 1938, of allegedly similar fish baits for future delivery.

The defendant's counterclaim charges that the plaintiff has sent notices of infringement and made threats and intimidations against defendant's customers and has caused its salesmen to do likewise, to induce the trade to refuse to order from defendant, thereby attempting to ruin defendant's business and causing defendant great loss and damage while plaintiff was deriving large profits therefrom. Following a hearing on November 10, 1939, the defendant was granted an order restraining the plaintiff from continuing such conduct until the case had been tried and determined.

I will take up first the Jamar patent, all claims of which are in suit.

As usual, the defenses are invalidity, or, if valid, not infringed. The first claim reads:

"A fish bait comprising a chambered body made from two separately formed end units with open ends provided with meeting surfaces disposed in a plane transverse to the bait axis, the walls of the body being of non-buoyant material and having an excess of thickness along the bottom of the bait to position the center of bait gravity below its axis, and means connecting the end units of the bait along their meeting surface in a manner to form a seal therebetween."

That claim, in a general way, describes the meat of that patent. Considering first the material of which the bait body is made, it is limited only as to being non-buoyant. In other words, the material in it is heavier than water. The claim was

made broad enough to cover all materials that are heavier than water.

The next thing that he discloses and claims is that he makes the bait body in more than one part and then connects these parts together transversely. It was old to make the bait out of something heavier than water, to make it hollow, to make it in more than one piece and to connect these pieces together transversely.

To make the bait body heavier along the bottom by an excess of thickness was not only old in this art, but also simple and old the world over in many arts. If you have something which is made of material heavier than water but will float because it is made with an air chamber and you wish it to float in a particular position, you make it thicker at the part which you want to be at the bottom, because the part that is thickest is also the heaviest. If the material is non-buoyant, the heaviest part of the structure will go to the bottom. Thus, if you make it out of non-buoyant material, and make it hollow with an excess of thickness, it is going to roll around in the water so that the thickest and heaviest part of it is down at the bottom. That was well known, and it was old in the art.

That claim reads on the prior art, hence the patent should not have been granted. As for the prior art, it is sufficient to refer to Shakespeare, No. 671,613 of April 9, 1901; Kreisser, No. 857,883 of June 25, 1907; Welch, No. 1,635,518 of July 12, 1927; and Sales, No. 573,572 of December 22, 1896. All of the other claims are void for similar reasons. The Jamar file wrapper shows that these prior patents were not cited by the Patent Office.

Long after the Jamar patent was issued, an effort was made to limit these claims which were so broad, and so lacking in invention. That effort has only been applied to the material out of which the bait was to be made.

■ On March 16, 1939, less than one month before this suit was started, a disclaimer was filed as follows:

"In each of the claims the units of the chambered body are formed from a plastic material susceptible of being molded to the desired shape as contrasted with bait bodies carved from wood or formed from metal, and bait bodies formed from wood or metal are herein expressly disclaimed."

That disclaimer is of the type that for years I have been condemning from this bench. Fruehauf Trailer Co. v. Highway Trailer Co., D.C., 54 F.2d 691, affirmed, 6 Cir., 67 F.2d 558. It comes entirely within my old illustration in this Fruehauf case of the man who obtained a poor and worthless patent from the Patent Office on a block of marble. Finding on the one hand that what he had secured so broadly was worthless in that it read on the prior art, and finding on the other hand a defendant who was making a Madonna that he wanted to reach and stop, he then went back to the Patent Office and knocked off all of those pieces of the block of marble except those which were necessary to form the outline of the thing which the defendant was making. He then asserted that what he had left in his claim was new and could not be found in the prior art.

When that happens, the Patent Office, which in the first instance has made an error, is never given a chance to say whether or not the thing which the plaintiff now tries to save out of the block of marble is new.

This case fits itself exactly into that picture. I hold as a matter of law that, even though the new claim carved out by the disclaimer had been so narrowed that it escaped the prior art, it still must fail.

Such a course of practice would abandon the assistance of the Patent Office. It would encourage patentees to use no care except to get all they could out of the Patent Office, good or bad, and then when the time came and they found someone doing something that they didn't like, to narrow their too broad claims down into something that would fit the defendant like a suit of clothes.

So here, the disclaimer attempts to select a particular kind of non-buoyant material and eliminate all the others. The amount eliminated is more than the amount kept. I have never had a better example of the block of marble and the Madonna than is furnished right here, because the claim as allowed covers all kinds of non-buoyant materials, whereas the disclaimer eliminates them all except plastic materials.

■ Another reason why I condemn this disclaimer is because it does not leave the patent with a definitely worded claim. A good patent should have a claim that can be read.

I am asked to take these four claims that are defined in this patent, read the disclaimer, and then, putting the two together,

I am to formulate the claims. For that added reason, this method of disclaiming should be condemned by the courts.

Finally, let us take the claims allowed by the Patent Office and sitting as a chancellor take pencil and paper and write out a claim which does eliminate everything except plastic material. Plastic material for fish baits is old in the art, as disclosed in the patents to Shakespeare 671,613 of April 9, 1901; Dewey 1,608,375 of November 23, 1926; Welch 1,635,518 of July 12, 1927; Welch 1,689,541 of October 30, 1928; Welch Re. 18,390 of March 22, 1932, and the British patents to Milward 19,431 of 1891; Allcock 20,907 of 1891, and Wadham 21,411 of 1909. I would hold that such claims, if regularly allowed by the Patent Office, would be void. None of these patents were cited by the Patent Office in the file wrapper of the Jamar patent.

The balancing of a bait made in this old way, by placing an excess of thickness or preponderance of material at the bottom, is old in the art, as disclosed in the patent to Welch, 1,635,518 of July 12, 1927; and weights have long been so used, as disclosed in the patents to Kreisser 857,883 of June 25, 1907 and Heddon 1,663,080 of March 20, 1928. If it were not old in the art, it is so well understood and so simple for anyone who wishes to balance a thing to do it, that I would say it did not involve invention.

Moreover, the anchoring of the screws for attaching the hooks or line in the balancing mass is also old in the art, as disclosed in the patents to Kreisser 857,883 of June 25, 1907, and Welch 1,635,518 of July 12, 1927, and involves no invention. Even the use of a transverse joint between the halves of a hollow fish bait is so old as to involve no invention, for it is disclosed in the patents to Dales 573,572 of December 22, 1896; Shakespeare 671,613 of April 9, 1901; Jefferson 994,927 of June 13, 1911 and Steffensen 1,878,015 of September 20, 1932, filed February 11, 1931. Kreisser 857,883 of June 25, 1907, also shows a jointed bait, as set forth in claim 2. None of these patents were cited by the Patent Office in the file wrapper of the Jamar patent. This Jamar patent is so clearly void that it would be a waste of time for this court to discuss the question of infringement. I simply say that the patent and all the claims of the patent are void.

Now I come to the Wooster design patent. Wooster claimed to have invented a new, original and ornamental design for a fish bait body. The specification states:

"The fish bait body is of conventional form in that it is transversely rounded. The surface ornamentation illustrated in the drawing is duplicated upon the opposite sides of the body."

For the moment, I am speaking only of the Wooster design patent and not of the claim of unfair competition. While not all such baits have been rounded, so many of them have been rounded that we hardly need give attention to that feature. The real claim made by the patentee is as to the surface ornamentation illustrated in the drawing, and the important feature of that ornamentation is what we have referred to as the herringbone pattern.

Since commencement of the present suit, the Wooster patent has been withdrawn by the plaintiff. There is a stipulation "that the plaintiff be permitted to amend its complaint by the entry of a decree, finding the Wooster design patent No. 93,-370 invalid in view of the prior state of the art." I do find it invalid, and in doing that I have in mind that it does not affect the plaintiff's claim of unfair competition. That disposes of the Wooster patent, and it is unnecessary for me to say more about it.

Next in order I will discuss the trademark on the box or label with red lines or stripes thereon. This is a very broad trademark. It is so brief that I will quote it before I discuss it.

"Be it known that James Heddon's Sons, a corporation duly organized under the laws of the State of Michigan and located in the city of Dowagiac, County of Cass, in said State, at which place its business is being conducted, has adopted and used the trademark shown in the accompanying drawing for fishing rods, parts thereof, and cases therefor, artificial baits, artificial bugs and flies, fishing reels, fish stringers, fish floats, fish hooks, fish lines, and pork rind and chunk for hooks, in Class 22, games, toys and sporting goods, and presents herewith five specimens showing the trademark as actually used by applicant upon the goods, and requests that the same be registered in the United States Patent Office in accordance with the Act of February 20, 1905 [15 U.S.C.A. § 81 et seq.]

174

"The trademark has been continuously used and applied to said goods in applicant's business since about the 1st of August, 1922.

"The trademark consists of a narrow red stripe and is applied to one or more edges of the boxes, bags or containers for the goods, or to labels affixed thereto, by printing with red ink, stitching with red thread or binding with red tape along one or more edges thereof. The representation of the box shown in the accompanying drawing is disclaimed."

This trademark registration is so broad that it does not attempt to mention anything except the color of which the line is made, namely, red. It does not state whether the background on which the red line is put is white, black, yellow, green, or any other color, and whether that red line is long or short, or on one side or many sides. The trademark registration seeks to cover all kinds of articles in the fishing tackle line, regardless of whether the red line be placed on a box or a tag, or on the article itself.

It seeks to obtain too much. There are only seven primary colors. These colors have been used ever since man first noticed the rainbow. Lines are common things, and people have long been using red lines and every other colored line.

It would not be right to let a monopoly be created in that sort of thing. It is old in this art, and it is old in the world broadly. Away back in 1905 in the case of Dennison Manufacturing Co. v. Scharf Tag, Label & Box Co., 135 F. 625, 630, the Sixth Circuit Court of Appeals held that the thing that is now attempted to be done on boxes in this art could not be done generally on labels. The Court, through Judge (later Justice) Lurton, held that a monopoly could not be obtained upon a red bordered label, because (135 F. page 630) "the label itself, being such a label in size, color, and form as was open to anybody to make". This trademark is void.

It is also claimed by plaintiff that the defendant infringes the trademark "Head-On Basser". The defendant uses the words "Millsite Bassor".

I am going to dispose of that trademark on the question of infringement. Incidentally, I don't attach any importance to the fact that the defendant spells the word "B-a-s-s-o-r".

As I see it and understand the law, the defendant has not infringed the trademark "Head-On Basser" by using his own name in connection with the bait he calls the Bassor. By using "Millsite Bassor", I don't think the defendant infringes a trademark on "Head-On Basser". Armour & Co. v. Louisville Provision Co., 6 Cir., 283 F. 42, 47.

If plaintiff had secured a trademark on the word "Basser", and was here seeking to enforce it, I would hold the trademark void. I don't think the plaintiff or anyone else can get a good trademark on the word "Basser" in the fish bait art any more than they could get a good trademark on the word "Bass".

You may not find the word "Basser" in the dictionary, but it is a word in keeping with our common use of the English language. A man who works is called a worker. If a man went around digging woodchucks all his life, somebody would begin to call him a woodchucker. If he fished for bullheads every night, they would call him a bullheader. By the same token, if he spent his time fishing for bass, people would call him a basser, and if he had a bait which he used for catching bass he would call it his "basser".

It is a common thing in the English language to form words by adding the suffix "-er" to other words. A trademark is not valid which attempts to prevent the common use of language.

I have not thought of anything that would make that complete trademark "Head-On Basser" invalid, but I am not passing on that here.

The defendant has only used the single word "Bassor" which I say is a word that everybody ought to be permitted to use. It is descriptive of a bait for catching bass. The defendant has coupled the word up with its own name. The words "Millsite Bassor" are not an infringement of that trademark.

Now I come to the question of unfair competition. Speaking generally, the cases in which the court applies that doctrine and gives the plaintiff relief, are where a defendant is palming off the defendant's goods upon the public by selling them to the public as and for the goods of the plaintiff. Kellogg Toasted Corn Flake Co. v. Quaker Oats Co., 6 Cir., 235 F. 657; Socony-Vacuum Oil Co. v. Rosen, 6 Cir., 108 F.2d 632, 635. That principle is big and broad and prevents a defendant from copying the goods of the plaintiff or mak-

ing them so similar that the public is deceived, or is likely to be deceived, and as a result purchase goods made by the defendant, believing such goods to have been made by the plaintiff. That sort of behavior is not fair to the public or to the plaintiff, and it is the sort of thing that the courts will not permit.

If this defendant has conducted its business and manufactured its articles which it offers for trade in such a way and of such a shape, color or kind and appearance that the public has been deceived, or is likely to be deceived into buying what the defendant has made, believing it to be what the plaintiff has made, then that is what the law condemns and that is what it is the duty of the court to enjoin. In every case, the court should look at the whole field, with the eyes of the public who are going to look at it.

The law of unfair competition is hitched up with the question of whether or not the plaintiffs have acquired property rights in certain things. I have said in many cases that a defendant could not do this and could not do that, because the thing it was doing was using some particular thing in which the plaintiff had acquired a property right. I ought to consider that in connection with this case.

Now, I am forced to say from what I have learned about this fishing tackle industry and this art, by the large amount of testimony which has been taken, and by being somewhat familiar with it through a long life that has included a lot of fishing, that we are dealing with an art that is quite different from that of any other case which has been presented to me. For instance, just to illustrate, there was the American Beverage case, American Products Co. v. American Products Co., D.C., 42 F.2d 488, appeal dismissed, 6 Cir., 59 F. 2d 1051. In that case, a distinct name and word had been coupled up with plaintiff's business for years, and the public came to recognize that the name went with their goods, which were sold from house to house. That name was the one thing that was emphasized in their literature, and their business grew up around it.

There are many big businesses that have grown up wherein they have taken one little thing, one slogan, one name, one designation, one design, and used it for years. For example, the rubber boot cases, in which the little round red spot on the rubber boot came to mean a particular maker —I remember my father telling me when a boy that the red spot meant that they were good boots, and that they were made by a good concern. That little round, red spot on a rubber boot went on through the years, and, of course, it became of great value to the manufacturer, and any other manufacturer that would commence using it would steal some business. Even though a defendant made its product very different in every other respect, the little round red spot would be likely to deceive. They had a right in that mark, and that is something very different from the situation here presented.

There is also such a thing as unfair competition by being a mere copyist and imitating the product of the plaintiff generally and completely in contrast to seizing a particular acquired right. The test is the same in both classes of cases, viz: Has the defendant imitated the goods of the plaintiff to such an extent and conducted its business in such a way that under all the circumstances of the particular case the defendant has palmed off his goods on the public as and for the goods of the plaintiff, or is he likely to do so if this conduct is continued?

In some cases, the plaintiff has acquired a right in a particular marking, not that it is trademarked, nor that he could get a good trademark on it, but that through years of use he has acquired a property right in it and a valuable right because the public has come to associate the particular thing with plaintiff's goods. But it takes quite a lot of use to emphasize that mark sufficiently to acquire a property right in it.

It means something more than putting one mark on today and another mark on tomorrow and having one thousand other marks—it means something different than that.

In one class of the cases, a defendant has taken a particular thing that belonged to the plaintiff and used it. That alone is going to deceive the public and hurt the plaintiff and help the defendant, and yet the articles do not look very much alike. In the other class of cases, there is the copyist who imitates the article so closely that he deceives the public in that way so you can't tell one from the other. In this present case, the claim of plaintiff mingles both theories so indiscriminately that I feel it is my duty now to talk about both of them. There has been confusion of thought, in my judgment, in the discussion

by not distinctly analyzing these two viewpoints.

So now, from the standpoint of acquiring property rights in these many things by this plaintiff, it is like the boy of the fable who reached into the jar to get nuts. The boy was so greedy and grabbed so many that he couldn't get his hand out of the jar and he lost them all. This plaintiff, like the other fishing tackle manufacturers, has attempted to adopt so many alleged trademarks, trade names, trade slogans and trade configurations, that, if one were to understand this fully and speak intelligently about all of the baits, slogans, boosts and names that have been used, it would be necessary to prepare a dictionary of substantial size.

Indeed, one can hardly use the English language in the fishing tackle trade without walking on somebody's toes, if all of these people engaged in this business are acquiring rights every time they use one of these names. For example, I counted on one of the boxes used by plaintiff (Exhibit 132) eight separate and distinct things in which plaintiff claims to have acquired property rights. The conduct of plaintiff is entirely different from those cases in which the courts have held property rights to have been acquired.

Plaintiff's business is not built up around a red line, for example. I am now considering something which might be owned by a plaintiff, such that if that individual thing is used by anybody else they would infringe the plaintiff's rights just as much as they would if it were a copyrighted thing. Plaintiff has used slogans, words, names, styles, shapes, colors and designs in such a wholesale and indiscriminate way that it can never by that method build up its business around any one of them, and the public will never be deceived by somebody else's use of one of them.

A manufacturer cannot build a business up around a thousand slogans. He cannot take a thousand words out of the dictionary and build a business around all of them and make the public stay away from all of them, and that is what these fishing tackle manufacturers are trying to do. This is plainly shown by their catalogs, their advertising and the witnesses.

If somebody else uses one of those shapes or colors or particular kinds of markings like a herringbone, he cannot be restrained on the theory that plaintiff has acquired a property right in that particular thing, because the plaintiff has used so many different things that the public has never come to associate its goods with any of those things.

Now I pass to the other theory for the purpose of determining whether the defendant has been such a copyist that the public has been deceived or is likely to be deceived by the similarity of the goods independent of any specific property rights of plaintiff.

I do not like the extent to which the defendant has copied. The only justification I can see for the defendant's taking a bait of the plaintiff and looking at it while painting its own bait is that there are so many things in this art, and so many manufacturers each with so many shapes, colors and designs, that I don't know but it would be necessary to look at as many as possible in order to make a bait which differed from the others. These baits are marked with nearly all the colors of the rainbow, but of course, red, white and black have for many years been the pronounced colors used on baits. The plaintiff cannot hope to prevent people who are starting in this industry and business from using black and red and white, or any other colors.

After getting at the defendant's motive, as nearly as I can, I have no sympathy for this defendant. I feel as I should toward the woman who doesn't have any taste of her own and who doesn't make her new dress just like the woman's next door, but gets it so much like it that the woman next door doesn't like it. But there isn't any law against being a copyist unless one copies to the extent that he palms off his goods as and for the other's. That is the test prescribed by the law.

I am not here to sit as an epicure for fish bait styles for manufacturers. My duty is to determine whether the defendant is palming off its goods as and for the plaintiff's.

The plaintiff has increased its business in a bait with a herringbone marking by advertising which, in my judgment, is misleading, and the defendant wanted to get in on a bait which would fill that misled desire by making a bait which would be different enough so that it would not mislead the public into thinking it was made by the plaintiff.

I don't think the defendant's scheme was to make a bait which would fool the public into thinking it was a bait which had been

made by the plaintiff. I think that the defendant did intend to make a bait having a herringbone marking which the public would think would attract and catch just as many fish as the plaintiff's bait. The plaintiff by very extensive and expensive advertising made the gullible part of the public believe that this herringbone marking on the bait increased its fish-getting qualities, and the gullible part of the public includes a good big part of the fishermen. The real fishermen and the old fishermen are few as compared with the thousands who think they are going to be fishermen and want to be, and hope to be, and enjoy getting ready to be, but never arrive. Dens are cluttered with high-priced fish boxes that wives have bought their husbands for Christmas, and baits that husbands have bought but never get around to use. There is a very big market among these inexperienced fishermen. The error has run through the years that artificial baits can be made in stripes, colors and markings that will fool the big fish into thinking they are real, natural, living creatures of a particular kind especially pleasing to the taste of big fish. It is a natural error and probably arises from "still fishing", since most people begin to fish with still fishing. This consists in using either a live bait or something that has been alive, and does not move rapidly through the water.

In still fishing, the fish sees the bait, he may smell of it, he may feel of it with his nose, and he may taste of it, because we know that in still fishing there is often a nibble before the bite. In still fishing, there is plenty of time for the big fish to reach a decision.

Out of that grows the erroneous idea that these hardware baits, these artificial lures that are manufactured out of material that cannot be eaten, will work in the same way, but they do not. It requires nothing but a little common sense to know that the fish doesn't taste of an artificial bait or he would never take it. He does not smell of it or he would never take it. He does not taste it or feel it, and we know that he does not see it clearly before the "strike" or he would never take it.

If he did taste, smell, feel or see distinctly the artificial bait and had any discretion at all, the fish would never bite any artificial bait yet made. These artificial baits are not made for still fishing. They are made for movement, for trolling, for casting, and for that sort of use where the fish sees the movement and thinks there is life, and that is all there is to it. The proof in this case is all one way, namely, that the fish does not see the details of the marking on the artificial bait.

All that color has to do with it is to permit the fish to see movement. He associates movement with something that he can eat, and if he is hungry he darts for the moving object.

Therefore, these little markings on the artificial bait, whether a herringbone or something else, are worthless, so far as the function is concerned, but they have furnished a fertile field for years for the manufacturers of artificial baits. I hold that this conduct on the plaintiff's part is not so bad that I would dismiss the suit on a good patent that had been infringed or any other suit unless it directly involved the actual results flowing from the false advertising. It is the kind of advertising which has not soiled the hands of plaintiff as to its entire business, but should be limited to the particular bait to which it was applied and the particular results growing therefrom.

The plaintiff in its advertising starts in with this foolish notion in the minds of many people, and encourages it, advertises it, and makes the public believe it instead of advertising the truth and advertising the bait on its merits. The plaintiff's advertising takes advantage of and stimulates this crazy idea that the fish is going to see the little markings. These little figures serve only to attract the person who buys the bait, and not the fish that is caught by the bait.

I discuss this also as bearing on the intent of the defendant. I am satisfied that the plaintiff's advertising, which is in the record, when fairly interpreted, means this. I recognize the kind of art I am dealing with and how boosting is mixed in with it, but this is more than boosting, it is more than exaggerating, it is plain untruth.

This advertising, fairly interpreted, said: "Big fish like to eat the shore minnows," which was true. It said: "Hold them up to the light and through that minnow you can see their little backbones and the ribs running down and the spines running up," which was true.

That advertising, then, just as clearly as could be, made the following claim: "We have a bait which is transparent, and we

have on the side of it lines like a backbone, like the ribs running down and like the spines running up. The big fish is going to see that bait of ours in the water, and as a result of his keen eyesight, he will see the backbone, ribs and spines, and think that it is one of those shore minnows, and bite it. We have been clever enough to fool him by those lines we have put on the outside, and if you buy our bait you are going to catch that big fish and go home happy because of those lines", which was a true description of the bait, but a false description of the results to flow from the bait.

I have added in the quoted part a little which I have read between the lines of the advertising, but I have added nothing except what was intended should be read and believed by the purchasing public. It was so read and believed and the plaintiff profited thereby.

Now the truth is that a fish doesn't see those lines at all. He can't read. He doesn't reason any such thing out at all. All he sees in that thing is something moving through the water, and he grabs it. He would have grabbed it just as quickly without the fish ribs painted on the sides, as he would have with them. There is the difference between what is false, and what is boosting.

The defendant's officials saw the plaintiff's baits and the advertising which fooled the public and wanted to get a part of that business, and so they painted a similar marking on their baits. They got a man named Ressler to paint a bait not with markings like plaintiff's, not for the purpose of deceiving the public into thinking that defendant's bait was made by the plaintiff, but enough different so that anybody looking at the bait or reading the advertising would know that it was not the bait of plaintiff's, yet carrying backbones, ribs and spines so that the people deceived by plaintiff's advertising would think that defendant's bait would do just as good a job as plaintiff's bait in fooling the big fish.

Now that is my opinion and findings as to what happened. It is not very bad, on the one hand, and yet not a very high and dignified line of advertising on the part of the plaintiff or effort on the part of the defendant.

I am not calling it unclean hands as ground for dismissing the entire suit, but I am saying that the plaintiff having built up this portion of its business by misleading advertising which falsely claimed the markings to be functional when they performed no function, it would be undignified and unjust for a court of equity to protect the plaintiff in its effort to harvest the results of its deception and thereby give plaintiff a monopoly in that kind of deception, part of which is just natural misunderstanding on the part of inexperienced fishermen and part of which is created by the misleading advertising of the plaintiff. In a way, it looks erroneous for a court to recognize that the public has been deceived by the misleading advertising and then dismiss the bill without any injunction and permit both parties to enjoy the fruits of such advertising. I am not asked by the pleadings to restrain the plaintiff from manufacturing, selling or advertising anything. The only thing defendant requests is an injunction against plaintiff which would restrain plaintiff from threatening defendant or the trade concerning the sale and purchase of defendant's baits. A court of equity will leave these parties much as it would two poker players to collect their debts as best they can and leave the public to its legal rights of law enforcement.

I have not discovered that the defendants have ever advertised this feature falsely. The defendant is simply trying to harvest part of the crop of "sucker" fishermen which has been produced by plaintiff's false and deceptive advertising.

Now I get back to this copying question: It is not a question of whether the defendant has taken this thing, that thing, or the other thing, but it is whether or not, taking all the things and the whole thing together, the public has ever been led to believe that defendant's baits were the baits of plaintiff, or is likely to be so deceived if the defendant continues. There is no showing that the public has ever been deceived. Plaintiff says confusion occurred in one instance out in Arizona, but it has to do with one bait and I just want to analyze that very briefly.

One bait made by the defendant was sent to the plaintiff by H. T. Lawrence in Arizona for replacement many months after it was bought. It is plain, and I find the fact to be, that the school teacher Lawrence just forgot where he bought the bait. When Lawrence discovered that the paint had gone bad on his bait, he sent it to the plaintiff to be repaired or replaced. It was not a case of similarity at all that misled him. It was just a case of poor memory, and it is

the kind of poor memory that is not surprising. It has happened over and over again. It is another example of the absent-minded professor.

Now let us consider the clerk in the hardware store to whom Lawrence went and got a bait box in which to mail the bait to plaintiff. Here is a man who is told by the school teacher Lawrence that it is a Heddon bait. He knew at the outset that his store had not sold the bait, would not exchange it, and had no responsibility, duty or part in it. The deposition of this witness was taken without cross-examination. I don't know how busy he was the day Lawrence asked for, and got, the box. Lawrence walked into the store, told him it was a Heddon bait, and he gets Lawrence a Heddon box for it.

That is a different thing than looking at baits with the purpose of buying or selling them. The school teacher made a mistake because of bad memory, and he told the clerk it was a Heddon bait and the clerk evidently believed him.

I hold that to be very far from the kind of confusion which justifies injunctions. I find, as a fact, that there never has been any instance shown by this record in which anybody bought one of these baits made by the defendant and thought he was getting the plaintiff's bait. There have been many of these baits sold, and what has happened in the past and what has not happened in the past is a pretty good guide for what is likely to happen in the future.

Somebody who had never seen a bait might look at these baits and say, "Well, they all look alike to me." Much testimony has been taken as to baits and as to how they are sold and how the business is conducted. The defendant's baits are so different from plaintiff's baits that no one has ever made a mistake and I don't believe any one ever will. That kind of deception was not one of defendant's motives in making its baits.

In one way, that sort of copying is a good thing in the world, if we are going to permit this kind of deceptive advertising. If unscrupulous persons are going to advertise hair tonic that will only feel good to the head but will not make hair grow on bald heads, as is claimed, maybe the fellow performs a real service who makes a product just like theirs and sells it at a low price, truthfully saying "I make this, no tonic will make the hair grow, but mine is made exactly the same as that high priced tonic they are advertising." That prevents the unscrupulous advertisers from charging too high prices for things.

The paint on the first baits made by both the plaintiff and the defendant became sticky, so the testimony states, and these sticky baits came back. The baits do not look enough alike to mislead the man who cares what kind of a bait he is going to buy. Recently the defendant is putting its name on its baits. I haven't any doubt that the defendant is going to continue to do so. If the defendant puts its name on its baits, people can't help but know they are not the plaintiff's baits.

I hold that the defendant is not guilty of unfair competition as regards the shape of its baits, the collar thereon, or the use of the herringbone marking thereon. The bait shape and collar are identical in all material respects with those in the plaintiff's expired Stolley Design patent No. 58,116 of June 7, 1921. Having enjoyed a monopoly in this design during the entire life of this patent, in the absence of palming off by the defendant, the plaintiff cannot perpetuate its monopoly under the guise of preventing unfair competition. Similarly, the herringbone marking is the essential feature of the plaintiff's invalid Wooster design patent No. 93,370 of September 18, 1934, which itself states that the shape of the body therein is conventional. Moreover, the plaintiff has stipulated that this design patent is invalid in view of the prior state of the art, and in so holding it invalid I further state that I have found the herringbone marking in many places, such as in the numerous publications offered in evidence by the defendant. Then, too, the defendant's herringbone marking differs so materially in appearance from that of plaintiff that I hold that no palming off of goods is intended or likely to occur. In the absence of palming off, the bait shape and collar of the expired Stolley design patent No. 58,116 and the herringbone marking are public property and incapable of exclusive appropriation by anyone.

From what I have said in holding invalid plaintiff's registered trademark on red-edged boxes and labels, I further hold the defendant not guilty of unfair competition in the use of red-edged boxes and labels. The evidence also shows that the defendant has prominently marked its boxes

with its name, "Millsite" on the top and sides, and that such boxes and labels have long been used by many manufacturers of fishing tackle, and by the Eppinger company continuously since 1918, several years before the plaintiff adopted its red edge in 1922. The evidence further shows that the founder of the Millsite business had used a red border in his business as far back as 1911.

From what I have also said in holding not infringed plaintiff's registered trademark "Head-On-Basser", I also hold the defendant not guilty of unfair competition in the use of the words "Millsite Bassor". As I stated previously, the use of the word "basser" or "bassor" is open to anybody. Being descriptive of the goods and having acquired no secondary meaning, it it not capable of exclusive appropriation by anyone.

I also hold the defendant not guilty of unfair competition in the use of the words "wounded minnow" for fish baits. These words are incapable of exclusive appropriation by anyone, being merely descriptive of the action of the baits and having acquired no secondary meaning. Moreover, the evidence shows that these words have been commonly used by many fish bait manufacturers for many years, and in fishing literature generally. The evidence also shows that the defendant never used the words beyond a preliminary announcement of a fish bait which it never actually manufactured.

I also hold the defendant not guilty of unfair competition in the use of the numeral "9" and letter "R" in its catalogs. The evidence shows that the defendant uses the term "99'R", pronounced "ninety-niner", in commemoration of 1899, the date when the founder of the Millsite business commenced business, whereas the nearest similar bait of the plaintiff bears the very different number "9110". The evidence further shows that the use of the number "9" and letter "R" is common in the fish bait trade. Under these circumstances, such numerals and letters are incapable of exclusive appropriation by anyone.

I also hold the defendant not guilty of unfair competition in its color chart of baits for the reason that the plaintiff itself has not introduced evidence sufficient to sustain it. The evidence shows that all the principal fish bait manufacturers publish color charts, and plaintiff has wholly failed to show any confusing similarity between the defendant's chart and its own chart.

I finally hold the defendant not guilty of unfair competition for publishing an advance announcement in October, 1938, of baits delivered in January or February, 1939. The evidence shows that it is common in the fish bait industry to make a preliminary anonuncement in the autumn of baits which are not delivered until the following winter and spring.

Taking all of these things done by defendant, both individually and collectively, they fall far short of unfair competition.

I also dismiss the defendant's counterclaim. The restraining order previously granted the defendant protected it and its customers from plaintiff's threats and intimidations until the present suit was tried and determined. The present decision in favor of the defendant disposes of the issues raised in its counterclaim. Hence future threats and intimidations of the kind protected against, are now impossible.

That covers all the issues in the case. Accordingly, I dismiss the plaintiff's bill and defendant's cross bill with costs to be taxed by defendant. This opinion may stand as my findings of fact and conclusions of law. The parties may have ten days from the date hereof in which to file requests for additional findings of fact and conclusions of law. Either side may notice settlement of decree immediately after said ten days.