**JAMES HEDDON'S SONS v. MILLSITE STEEL & WIRE WORKS, Inc.**

No. 8934.

Circuit Court of Appeals, Sixth Circuit.

May 6, 1942.

Ephraim Banning and Samuel W. Banning, both of Chicago, Ill. (Lloyd D. Heth and Laurence I. Wood, both of Chicago, Ill., on the brief), for appellant.

Willis Bugbee, of Detroit, Mich. (Barthel & Bugbee, Otto F. Barthel, and Julian Caplan, all of Detroit, Mich., on the brief), for appellee.

Before HAMILTON, MARTIN, and McALLISTER, Circuit Judges.

HAMILTON, Circuit Judge.

Appellant, plaintiff below, appeals from a decree dismissing its petition. The action commenced as a suit for the infringement of Jamar patent No. 1,892,892, relating to artificial fishing bait, and Wooster design patent No. 93,370, in the same art; also for infringement of registered trademark No. 154,046, "Head-On Basser" and for infringement of trademark No. 345,384, consisting of a red stripe applied to one or more edges of boxes or labels for fishing tackle, and also for unfair competition in simulating the form, appearance and marking of appellant's artificial bait, and appellant's boxes in which its products were displayed for sale.

In the course of the trial, appellant abandoned the charge of infringement of the Wooster design patent and the lower court found the Jamar patent invalid. From this portion of the decree appellant prosecuted no appeal. We are therefore concerned with the trademarks and the claim of unfair competition.

The parties to this appeal are competitors in the business of manufacturing and selling diversified items of fishing tackle and equipment. Appellee advertised and sold some of its products under the trade name "Millsite Bassor," appellant having previously duly registered in the patent office trademark 154,046, "Head-On Basser," which it had exploited. The lower court decided that the use by the appellee of the trademark "Millsite Bassor" was no infringement of the trademark "Head-On Basser."

Even if appellant has the right to the exclusive use of the trademark "Head-On Basser," when the applicable rule of law is correctly applied that one is an infringer who affixes the trademark of another to similar articles in such way that his use of it is liable to cause confusion in the trade or is calculated to mislead purchasers and induce them to buy his articles as goods of the other thus depriving the latter of the full benefit of his property, in our opinion appellee infringed no rights possessed by appellant by reason of the registration of its trademark.

Appellant's mark was arranged in composite form and as such constituted a symbol. Under such circumstances, it must be considered in its entirety, not separating the respective words from each other. Beckwith v. Commissioner of Patents, 252 U.S. 538, 546, 40 S.Ct. 414, 64 L. Ed. 705.

It is a fair inference that appellant wished to register a mark with some relation to its corporate name; therefore, the use of the word "Head-On." The word "Basser" is descriptive of the fish the bait is expected to catch and, standing alone in its ordinary signification, the word is not subject to trademark registration. Appellee used its corporate name "Millsite" in conjunction with the word "Bassor."

Schneider Brewing Co. v. Century Distilling Co., 10 Cir., 107 F.2d 699; Steem-Electric Co. v. Herzfield-Phillipson Co., 7 Cir., 118 F.2d 122.

When appellee's product is placed upon the market with its unregistered trademark on it, the average purchaser exercising ordinary care to buy appellant's article would not be induced to buy appellee's under the belief it was appellant's, Cf. Armour & Co. v. Louisville Provision Company, 6 Cir., 283 F. 42; Loughran v. Quaker City Chocolate & Confectionary Co., 3 Cir., 296 F. 822; Van Camp Sea Food Company v. Westgate Sea Products Company, 9 Cir., 28 F.2d 957.

Appellant's trademark No. 354,384 was registered in the patent office April 27, 1937, and in appellant's application it was recited it had been used in its business since August, 1922. The trademark consisted of "a narrow red stripe and is applied to one or more edges of the boxes, bags or containers for the goods, or to labels affixed thereto, by printing with red ink, stitching with red thread or binding with red tape along one or more edges thereof." The lower court fond this trademark void.

The allowance of the trademark by the Patent Office furnishes a presumption it is valid, and while it is true that a registered trademark cannot be cancelled except by direct attack in the way prescribed in the statute, trademarks registered under the law (15 U.S.C.A. § 121 et seq.) are not thereby rendered valid, and their validity may be collaterally attacked in any suit where material. The sole purpose of the Congress in authorizing the registration of trademarks was to enable persons in the United States to obtain their registration in other countries pursuant to treaties. Kellogg Co. v. National Biscuit Company, 2 Cir., 71 F.2d 662, cited with approval in Armstrong Paint & Varnish Works v. Nu-Enamel Corporation, 305 U. S. 315, 323, 59 S.Ct. 191, 83 L.Ed. 195.

As to the simple question of trademark, we think the lower court was correct. The boxes and packages used by appellant for its goods were in common use and the narrow red stripe applied to such boxes and containers is not a trademark and cannot be exclusively appropriated. It is true that the most universal element may be appropriated as the specific mark of a manufacturer's goods if it, is used and claimed with a sufficiently complex com-

bination of other things as to make the combination unique. There is nothing peculiar about the trademark in question and the boxes are in the appropriate and usual form in which to package articles for fishermen. The law of trademarks has not yet gone so far as to enable a party to appropriate such form of package or fashion of label as to exclude all others from their use or from the use of anything resembling them, either separately or in combination. The alleged trademark here is a colored label which gives a distinctive external appearance to the packages containing appellant's goods and one which indicates to some of the purchasing public that it contains appellant's goods, but does not point out distinctly the origin or ownership of the articles to which the label is affixed. Color, except in connection with some definite, arbitrary symbol or in association with some characteristics which serve to distinguish the article as made or sold by a particular person is not subject to trademark monopoly. Newcomer & Lewis v. Scriven Company, 6 Cir., 168 F. 621; Samson Cordage Works v. Puritan Cordage Mills, 6 Cir., 211 F. 603, L.R.A.1915F, 1107; Smith v. Walker, 57 Mich. 456, 22 N. W. 267, 24 N.W. 830, 26 N.W. 783; Dayton v. Imperial Sales, etc., Co., 195 Mich. 397, 161 N.W. 958.

It is a fundamental rule applicable to all cases of unfair competition that one man has no right to palm off his goods for sale as the goods of a rival dealer and that he cannot therefore be allowed to use names, letters or other indicia by which he may induce purchasers to believe that the goods which he is selling are the manufacture of another and this principle is applicable although no technical trademark is used by either.

On the issue of unlawful competition, the question of color per se and the use of a particular style of package are not always controlling. If appellee has made and sold its products so as to mislead the public, appellant is entitled to relief, regardless of the use of old or new forms of package or the style or shape of its products, and it is not so material on this issue as in a technical trademark infringement whether the appellant has the exclusive right in any one element of the dress or packing of the article, size, shape, coloring, lettering, wording or symbol, as long as the ensemble has come to be a pub-

lic guaranty of origin and quality. Enoch Morgan Sons Co. v. Ward, 7 Cir., 152 F. 690, 12 L.R.A.,N.S., 729; Hemmeter Cigar Company v. Congress Cigar Company, 6 Cir., 118 F.2d 64; Good Housekeeping Shop v. Smitter, 254 Mich. 592, 236 N.W. 872.

Appellant was engaged in manufacturing a product of ancient origin. In the 15th Volume of Aelian's Natural History, Third Century, A. D., there is described how the Macedonians captured a certain spotted fish in the river Ostrocus by means of a lure composed of colored wood and feathers used in what is known in modern fishermen's nomenclature as "dapping." In both ancient and modern literature on the subject of angling, many writers say that perfection is attained in artificial bait when it is manufactured in such shape and form as to simulate some fly, small fish or subaqueous creature and with the same motion as those on which the big fish is accustomed to feed.

For many years, appellant has been engaged in the manufacture of artificial baits commonly called "plugs" used to catch game fish. The plugs are attached by a leader to a line which is wound around a reel on a casting rod, manipulated by the fisherman to cause the plug to travel through the air until it strikes the water. It is then retrieved by reeling in the line. The plug is provided with one or more hooks. Appellant followed a custom of advertising its products widely in appropriate publications and also issued annually a catalog which was distributed among retail dealers and fishermen. In its catalogs and advertisements it used numerous trademarks, names, slogans, and trade configurations.

One of its products was sold under the registered trademark "River Runt." This bait has a comparatively short and stubby body, terminating in a somewhat blunt nose at the forward end beneath which is fastened a spoon-shaped, metallic collar. The body is provided with a forward gang, depending from a point slightly behind the collar and the rear gang secured to the tail. In 1933 appellant began the manufacture of some of its "River Runt" bait of plastics and applied to some of them a herringbone pattern on each side which simulated the bones of a fish to which pattern it referred in its advertising as "shore minnow finish." It was said to simulate live shore minnows,

the outline of whose skeleton could be seen under certain lighting conditions.

Appellant spent large sums of money in advertising its "River Runt" bait in which it called special attention to the alleged fact that it had a shore minnow finish and it also exploited its trademark "River Runt," calling attention to dealers and others that this mark was its exclusive property.

Appellant packaged all of its products in boxes, or wrappers with a red border and in its catalogs and advertisements called purchasers' attention to this fact and urged them to look for Heddon's products in the "box with the red edge" and on its letterheads it placed a picture of a red edged box with the printed phrase "look for the box with the red edge."

In 1938, appellee published a catalog listing a bait which it manufactured and sold and which in its structural features was practically a copy of the bait appellant had theretofore sold under the trademark "River Runt." This bait had herringbone markings on the sides which were indistinguishable from appellant's unless critically and closely examined. Appellant immediately notified appellee that it was simulating and infringing a herringbone marked bait described in the Jamar patent, owned by appellant.

Appellee placed its bait on the market in 1939, in boxes and packages, some of which were the same size and shape as appellant's with the sides in red with white lettering, and the tops in white with red lettering. The name "Millsite" was printed in large and conspicuous letters in contrasting colors at the top and bottom of the boxes, white predominating on top and red on the sides. One end of appellee's boxes was red with the phrase "Millsite Fishing Tackle protected by patents granted and pending" printed thereon. One end of appellant's boxes had a red border with a white panel on which was printed "A Record money cannot buy. In all the years of 'Field & Stream's' National Fish contests, more prize bass on Heddon Baits than on any other make of lure. Proof of National Leadership." On the opposite end of appellee's boxes was a white surface with a narrow red border. On the white surface was printed the trade name of the bait, with numerals indicating price, catalog number and type of bait. The opposite end of appellant's box was white with a red

border, there being printed on the white surface "Heddon-Dowagiac" and stamped thereon catalog number, price indicia and the trademark "River Runt."

The top of appellee's boxes had a picture of a large fish caught on a lure. Appellant's boxes had distributed on their respective sides nine pictures of fishermen holding catches of fish, with the name of the fishermen under each. Appellee at no time used the trademark "River Runt," but when its bait was first placed on the market, neither bait nor boxes had the name "Millsite" on them. This was later changed and the name put on the boxes and on the bottom of the bait. When the boxes were opened and put on dealers' counters for display purposes, the name "Millsite" appeared only on one end. The boxes of both appellant and appellee had in them folders with their respective corporate names on them and the origin and description of the bait.

Appellant had for many years a trade practice of listing its composition baits under a serial designation, each beginning with the numeral "9." When appellee placed its tenite baits on the market, it listed them in its catalog as the "99'r" series.

Appellant introduced one witness who testified that at the behest of one of its officers, he wrote appellee requesting a copy of its catalog and inclosed $1.20 "for two of the new River Runts" and that appellee sent him its bait. Another witness who was a salesman for appellant testified that he wrote a retailer requesting him to send to him "one of the tenite 49 C River Runts with red rib" and that he received appellee's bait. This dealer listed in his catalog as selling for 49 cents a bait manufactured by appellee and known as "Tenite." It was similar in shape to appellant's River Runt and had a red rib. Appellant's vice president and sales manager testified he went into a retail store in Chicago, Illinois, and asked for a "River Runt Spook bait" and the salesman showed him appellant's River Runt bait and that he then inquired for a cheaper "River Runt" on which inquiry the salesman showed him one of appellee's baits selling at 39 cents. Another witness testified that one of appellant's salesmen lived at his home and that at the request of the salesman, he went to a fishing tackle store and asked a clerk for a "River Runt" bait which was shown him and that he then inquired of the clerk if there wasn't a cheaper River Runt, whereupon the clerk sold him appellee's bait at a less price than appellant's. Another witness living at Prescott, Arizona, testified he found a defective plug bait in his tackle box and took it to a hardware store for replacement and at the suggestion of the clerk he put the bait in a Heddon box and mailed it to the Heddon Company for replacement under the belief it was a Heddon product. Other witnesses testified this particular piece of bait was manufactured by appellee.

The above is all of the evidence in the record of the alleged confusion of the products of appellant and appellee. However, appellant insists that immediately on the appearance of appellee's products on the market, it stigmatized them as unlawful simulations and undertook to prevent the public from being deceived.

Appellee employed a tool and die maker and manufacturing engineer to design its questioned baits. This witness testified that appellee's vice president and general manager employed him to design the bait and told him that other manufacturers were making baits of wood similar to the Heddon baits and that if he could design one of tenite imitating the Heddon bait that it would sell. This witness testified that pursuant to this request he designed a bait of tenite similar in size and shape to the Heddon bait but that there were definite differences in radiuses, contours and angles. He stated that he measured the dimensions of the Heddon bait with the intent of making such departures as were necessary to avoid duplication. He also stated that he looked at patent papers in appellee's files and found nothing in them relating to exterior markings on the bait and that thereafter he painted various designs, some with herringbones and some with other markings. However, he said he left the employ of appellee before the baits in question were manufactured and placed on the market by the appellee. There were exhibited to this witness the baits of appellant and the questioned ones of appellee. The witness, after examining them, stated he could not tell them apart except by the method of hook fastening and that had he not been familiar with that feature, he would not have been able to differentiate them.

On the foregoing facts, the trial court found there was no substantial evidence of unfair competition on the part of appel-

lee, of which appellant had just cause of complaint.

Appellant urges that the trial court fell into error due to the fact that it broke appellant's shield of trade protection into shreds and viewed the debris as made up of old features common to articles of the class in which both the products of appellant and appellee belonged. Appellant says a fair appraisal of the evidence shows that appellee made unnecessary imitations of the nonfunctional parts of appellant's product and packaged them in such way that the two articles appear to the casual observer to be substantially identical in appearance and that retail purchasers are thus likely to mistake one for the other.

The uncontradicted evidence shows that appellant has a valuable good will in the business of manufacturing and selling its particular types of product. However, there are presented practical difficulties which are present in many unfair competition cases, where the right of the complainant to use his chosen means of designation for his product is not exclusive. Appellant's good will is dependent upon the use of its trademark "River Runt" and the combination of features in the manufacture of the bait and its packaging, giving it a distinctive appearance. Some of the indicia of origin of the goods of appellant belong to the public for any proper use, and as such appellee has an equal right to them. Appellant cannot complain of the use by appellee of any which it has an equal right to use, even though it makes an exact copy or duplicate. Dennison Mfg. Co. v. Scharf Tag, Label & Box Company, 6 Cir., 135 F. 625; Keystone Type Foundry v. Portland Publishing Company, 1 Cir., 186 F. 690.

From an inspection of the exhibits in connection with the weight of the evidence, in our opinion it clearly appears that the things which make appellee's box at one end similar to appellant's are those in common use and in the present case the dissimilarities are sufficient to make it easy when comparing the boxes to distinguish them. The differences are more observable to the ordinary purchaser than the resemblances. Proctor & Gamble Co. v. Globe Refining Company, 6 Cir., 92 F. 357; Postum Cereal Company v. American Health Food Company, 7 Cir., 119 F. 848.

Appellee's bait design is so similar to appellant's that it would be frivolous to allow appellee to escape on the ground of dissimilarity. Appellant urges that by many sales and much advertising, the form of its article had acquired a secondary meaning disassociated from its trademark "River Runt" or its packaging.

There is no showing in the record that any person purchased appellee's bait because of its shape, size or dimensions believing it to be the product of appellant. All of the witnesses who testified on the subject and on whom appellant relies to show confusion stated that they called for the bait under its trade name "River Runt" and on inquiry for a cheaper bait, the salesman sold them appellee's product. There is an entire absence of proof showing that appellee's bait of the design in question had been bought because the purchaser believed it originated with appellant rather than because they were useful articles with an attractive appearance. Appellee's bait having been provided with its own name plate, there seems to be no reason from the evidence in the record to suppose that confusion might arise. In any event the evidence does not show that the trial court's finding on this subject was clearly erroneous. It is to be remembered that appellee would have the right to slavishly copy the form, shape and size of appellant's bait, it being without trademark or patent protection, so long as it did not represent that the goods sold were those of appellant. Moreover the elements of the two baits are functional to such an extent that nothing short of a showing of clear likelihood of confusion would justify a court of equity granting appellant relief. J. C. Penney Co. v. H. D. Lee Mercantile Co., 8 Cir., 120 F.2d 949. As bearing upon the question of fraudulent intent, the history of appellant's imitated bait is pertinent. Appellant has attached to its bait, a metal collar which is also found in appellee's product. On December 27, 1920, William A. Stolley applied for and on June 2, 1921, had issued to him by the patent office Design Patent No. 58116, which he immediately assigned to appellant and which expired in 1935. The trial court found as a fact that the shape of appellant's bait and the attached collar were identical in all material respects with those described in the Stolley design patent, and further found that the herringbone marking on appellant's bait is the essential feature of the invalid Wooster Design

patent. The trial court also found that herringbone markings were old to the fishing tackle art (35 F.Supp. 169, 179).

■ Generally the question of whether or not a defendant has been guilty of unfair competition is one of law and fact and is for the trial court to determine. We cannot say that the evidence here decidedly preponderates against the trial court's finding. Kendall v. Trico Products Corporation, 6 Cir., 31 F.2d 522.

■ Clearly appellant cannot, as patentee, claim a monopoly beyond the life of the patent on the form and shape of its bait described therein. It is equally clear that so much of the shape and size of appellant's bait and markings as were old to the art and such features of it as are functional are not susceptible of exclusive appropriation by appellant, but are the common property of all mankind. Kellogg Company v. National Biscuit Company, 305 U.S. 111, 118, 59 S.Ct. 109, 83 L.Ed. 73. In this connection it is well to point out that a feature of goods is functional if it affects their purpose, action or performance or the facility or economy of processing, handling or using them, or if the shape, size or form of the article contributes to their utility, durability or effectiveness or the ease with which they serve their function. When specifically applied to the manufacture of artificial fishing bait, shape, size and color may be altogether functional. Restatement of Torts, Section 742.

Appellant insists that appellee's appropriation of the numeral "9" as a characteristic numeral in the listing of its tenite baits is of great significance when considered in conjunction with the other alleged acts of unfair competition of which it complains. We do not so view it.

■■ The trial court found that the use by appellee in its catalogs of the numeral "9" and letter "R" in combination and pronounced "ninety-niner" was in commemoration of the founding of its business in 1899 and that in advertising a similar bait, appellant used the numerals "9110," etc. It further found that the number 9 and letter R are in common use in the fishing bait trade and that appellee was not guilty of unfair competition by reason of their use. Since this finding of the court is supported by substantial evidence and is not clearly erroneous, we shall not disturb it.

■ Under the laws of Michigan, unfair competition consists in the simulation by one person of the names, symbols, or devices employed by another for the purpose of deceiving the public, or the substitution of goods or wares of one person for those of another, thus falsely inducing the purchase of his goods and obtaining the benefit belonging to a competitor. No one shall by imitation or unfair devices induce the public to believe that goods offered for sale by him are those of another thus benefiting by the reputation the other has acquired for his own product or merchandise. Each case must be decided on the particular facts presented therein. Carbonated Beverages v. Wisko, 297 Mich. 80, 297 N.W. 79.

■ The evidence is clear that appellant's artificial bait was bought and sold not because of its distinctive shape or appendages, but because of the name of the maker and its trademark "River Runt." Appellee has not used appellant's name or its trademark in the sale of its goods.

Considering all the circumstances under which appellant's and appellee's artificial baits were manufactured and sold, we are of the opinion appellant has failed to prove a case of unfair competition as defined under the laws of Michigan.

Decree affirmed.